# UNITED STATES DISTRICT COURT
# FOR THE SOUTHERN DISTRICT OF OHIO
# EASTERN DIVISION

**UNITED STATES OF AMERICA,**

    **Plaintiffs,**

    v.

    **Case No. 22-3906**
    **Judge Edmund A. Sargus, Jr.**
    **Magistrate Judge Kimberly A. Jolson**

**UTICA RESOURCE OPERATING, LLC,**

    **Defendant.**

## ORDER

This matter is before the Court on Plaintiff United State of America's Motion to Enter Consent Decree. (ECF No. 5). The Defendant in this lawsuit – Utica Resource Operating, LLC ("URO") – has co-signed the proposed Consent Decree and supports its approval and entry as a final judgment in this case. The Defendant will not be filing a brief or making an appearance in response to this Motion, so the Motion is ripe for decision.

The U.S. Department of Justice gave notice of the proposed settlement in the Federal Register and solicited public comment during a 30-day period that commenced upon publication of the notice. *See* 87 Fed. Reg. 68,194 (November 14, 2022). No comments were received.

The Court approves and enters the Consent Decree because the settlement that it memorializes is fair, adequate, reasonable, and consistent with the Clean Air Act and the public interest, as shown below.

**Background and Introduction**

I. **URO's Facilities and the Alleged Violations**

On November 4, 2022, the United States filed a Complaint in this action seeking civil penalties and injunctive relief for alleged violations of the Clean Air Act, 42 U.S.C. §§ 7401-7671q, at eleven oil and natural gas production well pads that URO owns and operates in Ohio (the "Facilities"). (ECF No. 1; text-searchable document at ECF No. 4). On the same day, the United States lodged a proposed Consent Decree containing terms of a settlement. (ECF No. 2-1).

URO owns and operates production wells that extract oil and gas in southern and eastern Ohio. The wells produce a mixture of three materials: (i) natural gas; (ii) crude oil; and (iii) oily wastewater. In most instances, several wells are connected to a nearby well pad that contains equipment used to separate these materials. After being separated, the natural gas is transported from the well pad by a pipeline. The crude oil and oily wastewater are accumulated in separate tanks at the well pad until those liquids are transferred to tank trucks and transported off-site.

The United States' Complaint alleges that URO has violated statutory and regulatory requirements applicable to storage tanks at the Facilities arising under the Clean Air Act and EPA regulations establishing standards of performance for crude oil and natural gas production, transmission, and distribution facilities (codified at 40 C.F.R. Part 60, Subparts OOOO and OOOOa), as well as corresponding requirements in URO's Clean Air Act

operating permits for the Facilities. Most of those requirements are designed to control volatile organic compound ("VOC") emissions from the Facilities. VOC emissions are a precursor to ground-level ozone, which can contribute to a variety of health problems including chest pain, coughing, throat irritation, and congestion. URO's excess tank emissions also include methane, a potent greenhouse gas that contributes to climate change.

**I. Consent Decree Provisions**

The terms of the proposed Consent Decree were negotiated at arms-length over a number of months, with substantial give-and-take by experienced environmental lawyers and technical experts representing the United States and URO. During the negotiations, the parties exchanged technical information relating to the Facilities and other information for evaluating possible injunctive relief and civil penalties.

The Consent Decree requires URO to pay a $1,000,000 civil penalty, complete a suite of injunctive relief at fifteen well pads to come into compliance with the NSPS and the facility operating permits, and implement mitigation measures at many of the well pads owned by URO. Key to the Consent Decree is a multi-step compliance program to review the current design of each tank and vapor control system and then make necessary design improvements to ensure that vapors will not be released to the atmosphere during operations.

## Legal Standard and Analysis

As the Supreme Court has recognized:

> Consent decrees are entered into by parties to a case after careful negotiation has produced agreement on their precise terms      Naturally, the agreement reached normally embodies a compromise; in exchange for the saving of cost and elimination of risk, the parties each give up something they might have won had they proceeded with the litigation.

*United States v. Armour & Co.*, 402 U.S. 673, 681-82 (1971)[1]. A consent decree that settles an environmental enforcement action may reflect a completely appropriate strategic election by the government to negotiate for "extensive relief without the burden of proving its case." *BP Exploration*, 167 F. Supp. 2d at 1054.

In judging a proposed consent decree in an environmental enforcement action, a district court should approve the settlement if the government shows that it is fair (both procedurally and substantively), reasonable, and consistent with the public interest and the goals of the applicable law. *See United States v. Akzo Coatings of Am., Inc.*, 949 F.2d 1409, 1424 (6th Cir. 1991); *Whiting Paper*, 644 F.3d at 372; *BP Exploration*, 167 F. Supp. 2d at 1049. "Procedural fairness concerns the negotiations process, *i.e.*, whether it was open and at arms-length" while "[s]ubstantive fairness concerns concepts of corrective justice and accountability." *BP Exploration*, 167 F. Supp. 2d at 1049. A district court should be "chary of disapproving a Consent Decree" and may not deny approval unless the decree "is unfair, unreasonable, or inadequate." *E.E.O.C. v. Hiram Walker & Sons, Inc.*, 768 F.2d 884, 889-90 (7th Cir. 1985).

Government agencies with "substantial expertise," such as EPA, should be granted broad deference when evaluating whether a settlement is fair, reasonable, and in the public

---

[1] *Accord Does 1-2 v. Déjà Vu Services, Inc.*, 925 F.3d 886, 895-96 (6th Cir. 2019) ("[I]t is the very uncertainty of outcome in litigation and avoidance of wasteful and expensive litigation that induce consensual settlements.") (internal quotation omitted); *United States v. George A. Whiting Paper Co.*, 644 F.3d 368, 372 (7th Cir. 2011) ("By its nature, a consent decree eliminates many possible outcomes that would have been better for one side or the other."); *United States v. BP Exploration & Oil Co.*, 167 F. Supp. 2d 1045, 1054 (N.D. Ind. 2001) (In a consent decree, it is typical and unremarkable that "[n]o party in the case got everything it wanted").

interest. *See, e.g., United States v. District of Columbia*, 933 F. Supp. 42, 47 (D.D.C. 1996); *see also Whiting Paper,* 644 F.3d at 372 (explaining that the "trial court must defer to the expertise of the agency and to the federal policy encouraging settlement"). The judicial deference to environmental settlements reached by the parties is "particularly strong" where, as here, that settlement "has been negotiated by the Department of Justice on behalf of a federal administrative agency like EPA which enjoys substantial expertise in the environmental field." *Akzo Coatings*, 949 F.2d at 1436; *see also Whiting Paper*, 644 F.3d at 372; *United States v. Davis*, 261 F.3d 1, 21 (1st Cir. 2001).

In examining a proposed consent decree like this one, a court need not determine that "the settlement is one which the court itself might have fashioned, or consider[ed] as ideal." *United States v. Cannons Eng'g Corp.*, 899 F.2d 79, 84 (1st Cir. 1990). *Accord Akzo Coatings*, 949 F.2d at 1435; *BP Expl.*, 167 F. Supp. 2d at 1050 ("The test is not whether this Court would have fashioned the same remedy nor whether it is the best possible settlement."). Settlements of government-initiated environmental enforcement actions also deserve special deference because they fall within "an area where voluntary compliance by the parties . . . will contribute significantly toward ultimate achievement of statutory goals." *Kelley v. Thomas Solvent Co.*, 717 F. Supp. 507, 516 (W.D. Mich. 1989) (citation and internal quotation omitted).

The proposed Consent Decree is fair, reasonable, and consistent with the public interest and the purposes of the Clean Air Act. The settlement was the product of months of arms-length negotiations by counsel with expertise in environmental law, with substantial assistance from experienced technical representatives from EPA and URO. The Consent Decree embodies a fair and reasonable compromise, and the settlement would have the

benefit of resolving the government's claims without protracted litigation, thereby avoiding a potentially significant devotion of time and resources by the Court and the parties.

The Complaint and the Consent Decree address URO's noncompliance with Clean Air Act emission control requirements that apply to its oil and gas well pad Facilities.  These requirements are imposed by EPA regulations establishing standards of performance for crude oil and natural gas production, transmission, and distribution facilities (codified at 40 C.F.R. Part 60, Subparts OOOO and OOOOa), and the Facilities' Clean Air Act operating permits that incorporate many requirements of Subparts OOOO and OOOOa.  Among other things, the regulations require measures to limit the uncontrolled emission of VOCs from storage tanks at covered oil and gas production facilities, and they also impose associated inspection, recordkeeping, and reporting obligations.[2] The proposed Consent Decree requires compliance with these regulations and permits.

The injunctive relief provisions in Consent Decree Section IV also require URO to follow a regime that includes a thorough review and possible adjustment of its tank and piping designs at the well pads, periodic use of special infrared monitoring equipment and real-time tank pressure monitoring to detect VOC emissions, and response and corrective measures protocols if improperly controlled emissions are detected.  This compliance program is consistent with the injunctive relief included in several prior settlements addressing VOC

---

[2] For example, the regulations include requirements that:  (1) "[t]he cover and all openings on the cover . . . shall form a continuous impermeable barrier over the entire surface area of the liquid in the storage vessel"; (2) subject to limited exceptions, "[e]ach cover opening shall be secured in a closed, sealed position . . . whenever material is in the unit"; (3) the tank owner "must design the closed vent system to route all gases, vapors, and fumes emitted from the material in the storage vessel to a control device"; and (4) the owner "must design and operate a closed vent system with no detectable emissions."  40 C.F.R. § 60.5411(b), (c).

emissions from storage tank systems operated by other oil and gas producers, including a 2020 consent decree in *United States v. Gulfport Energy Corp.*, Case No. 2:20-cv-00340 (S.D. Ohio).

In some instances, the United States was able to negotiate settlement terms that go beyond the applicable regulatory requirements, such as the environmental mitigation measures included in Consent Decree Section IV.H.  To help offset at least some of its unauthorized past emissions from the Facilities targeted in the Complaint, Consent Decree Section IV.H requires: replacement of 102 thief hatches with lower leak rate models; conversion of 466 pneumatic controllers to non-emitting models and routing of 43 controllers to a vapor recovery unit or combustion device; and connection of certain Facilities to the electric grid and replacement of gas engines with electric motors.  The mitigation projects at the various Facilities will cost URO an estimated $1,500,000.

In addition to accepting these forward-looking obligations, URO would pay a $1,000,000 civil penalty for its past non-compliance.  Beyond recouping an arguable economic benefit of noncompliance that URO realized, this amount includes a significant gravity-based penalty to advance the interests of punishment and deterrence.  The proposed Consent Decree also includes typical features to ensure consistent compliance, such as stipulated penalties for specified violations and a retention of jurisdiction to allow judicial resolution of disputes over Consent Decree compliance, if necessary.

The proposed Consent Decree represents an appropriate alternative to litigation of the claims set forth in the Complaint.  Litigation of those claims could be complicated, time-consuming, and costly, and there is little assurance that a judgment obtained after years of litigation would be more favorable than the negotiated settlement terms included in the

Consent Decree. Many of the settlement terms here are intricate and technically complex, which reflects the fact that they resulted from many months of concerted negotiations by specialists in the environmental field.

## Conclusion

For the foregoing reasons, this Court finds that the proposed Consent Decree is fair, reasonable, consistent with the goals of the Clean Air Act, and in the public interest. Therefore, the Court **APPROVES** the Consent Decree.

**IT IS SO ORDERED.**

**4/3/2023**                                         **s/Edmund A. Sargus, Jr.**
**DATED**                                               **EDMUND A. SARGUS, JR.**
                                                                    **UNITED STATES DISTRICT JUDGE**