**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF OHIO**

| | |
|---|---|
| UNITED STATES OF AMERICA, | ) |
| | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) |
| | ) Civil Action No. 22-3906 |
| UTICA RESOURCE OPERATING, LLC, | ) |
| | ) |
| Defendant. | ) |
| | ) |
| | ) |
| | ) |
| _____ | ) |

**CONSENT DECREE**

## TABLE OF CONTENTS

I.    JURISDICTION AND VENUE ........................................................................1

II.    APPLICABILITY ..........................................................................................2

III.  DEFINITIONS...............................................................................................3

IV.  COMPLIANCE REQUIREMENTS ..............................................................6

    A.   General Compliance Requirements ....................................................6

    B.   Vapor Control Systems Modeling and Engineering Design..................6

    C.   Vapor Control Systems Field Surveys and Engineering Evaluation...................9

    D.   Vapor Control Systems Modifications ..............................................10

    E.   Performance Standards, Preventative Maintenance, and Corrective Action.....................12

    F.   Tank Pressure Monitoring.................................................................18

    G.   Effect of Plug and Abandonment .....................................................19

    H.   Mitigation ........................................................................................19

    I.   Permits.............................................................................................20

    J.   Approval of Deliverables..................................................................20

V.    CIVIL PENALTY .......................................................................................21

VI.  REPORTING REQUIREMENTS ................................................................21

VII. STIPULATED PENALTIES.........................................................................23

VIII.FORCE MAJEURE ....................................................................................26

IX.  DISPUTE RESOLUTION...........................................................................27

X.    RIGHT OF ENTRY AND INFORMATION COLLECTION AND RETENTION .............29

XI.  EFFECT OF SETTLEMENT/RESERVATION OF RIGHTS ............................30

XII. COSTS.......................................................................................................31

XIII.NOTICES ..................................................................................................31

XIV.EFFECTIVE DATE ....................................................................................32

XV. RETENTION OF JURISDICTION..............................................................32

i

XVI. MODIFICATION................................................................................................33

XVII. TERMINATION................................................................................................33

XVIII. PUBLIC PARTICIPATION............................................................................33

XIX. SIGNATORIES/SERVICE ...............................................................................34

XX.  INTEGRATION ................................................................................................34

XXI. FINAL JUDGMENT .........................................................................................34

XXII. 26 U.S.C. SECTION 162(F)(2)(a)(ii) IDENTIFICATION ................................. 34

XXIII.  APPENDICES ................................................................................................34

## TABLE OF APPENDICES

| Appendix 1 | List of Subject Facilities |
|---|---|

## CONSENT DECREE

WHEREAS, Plaintiff United States of America ("United States"), on behalf of the United States Environmental Protection Agency ("U.S. EPA"), has filed a complaint in this action ("Complaint") concurrently with this Consent Decree alleging that the Defendant, Utica Resource Operating, LLC ("URO"), violated: (1) the New Source Performance Standards ("NSPS") under the Clean Air Act ("CAA"), 42 U.S.C. § 7411, including the NSPS regulations at 40 C.F.R. Part 60, Subpart OOOO and 40 C.F.R. Part 60, Subpart OOOOa; (2) provisions of the federally-enforceable state implementation plan ("SIP") for Ohio; and (3) provisions of URO's CAA permits.

WHEREAS, the Complaint alleges that the above violations took place at eleven (11) oil and gas production well pads, owned and operated by URO ("Facilities") since April 2018;

WHEREAS, URO does not admit any liability to the United States arising out of the transactions or occurrences alleged in the Complaint;

WHEREAS, URO has undertaken several facility and operational enhancements to further minimize emissions at its facilities, including upgrading the rubber gaskets utilized at its facilities, testing an improved design of its thief hatch flanges, enhancing well tender training, and improvement of SCADA data collection, monitoring, and notification;

WHEREAS, the United States and URO (the "Parties") recognize, and the Court by entering this Consent Decree finds, that this Consent Decree has been negotiated by the Parties in good faith and will avoid litigation between the Parties and that this Consent Decree is fair, reasonable, and in the public interest;

NOW, THEREFORE, before the taking of any testimony, without the adjudication or admission of any issue of fact or law except as provided in Section I (Jurisdiction and Venue), and with the consent of the Parties, IT IS HEREBY ADJUDGED, ORDERED, AND DECREED as follows:

## I. JURISDICTION AND VENUE

1. This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§ 1331, 1345, and 1355, and Section 113(b) of the CAA, 42 U.S.C. § 7413(b), and over the Parties. Venue lies in this District pursuant to Section 113(b) of the CAA, 42 U.S.C. § 7413(b), and 28 U.S.C. §§ 1391(b) and (c) and 1395(a), because the violations alleged in the Complaint are alleged to have occurred in, and URO conducts business in, this judicial district. URO consents to this Court's jurisdiction over this Consent Decree and any action to enforce this Consent Decree, and to venue in this judicial district.

2. The State of Ohio has actual notice of the commencement of this action in accordance with the requirements of Section 113 of the CAA, 42 U.S.C. § 7413.

1

3.      For purposes of this Consent Decree, URO agrees that the Complaint states claims upon which relief may be granted pursuant to Section 113(b) of the CAA, 42 U.S.C. § 7413(b).

## II.    **APPLICABILITY**

4.      The obligations of this Consent Decree apply to and are binding upon the United States and upon URO and any successors, assigns, or other entities or persons otherwise bound by law.

5.      No transfer of ownership or operation of the Facility, whether in compliance with the procedures of this Paragraph or otherwise, shall relieve URO of its obligation to ensure that the terms of the Decree are implemented, unless (1) the transferee agrees to undertake the obligations required by Sections IV and VI of this Decree and to be substituted for the Defendant as a Party under the Decree and thus be bound by the terms thereof, and (2) the United States consents to relieve URO of its obligations under the Consent Decree. The United States may refuse to approve such a modification to the Consent Decree if it determines that the proposed transferee does not possess the requisite technical abilities and/or financial means to implement the Consent Decree. If the United States opposes the substitution, the issue shall be subject to dispute resolution pursuant to Section IX (Dispute Resolution). URO may invoke dispute resolution pursuant to Section IX (Dispute Resolution) no earlier than 30 Days after the notice of the prospective transfer required by this Paragraph. If the United States agrees to the substitution, the parties will file an unopposed motion with the Court seeking such substitution and upon the Court's entry of an order granting such motion and the transfer of the Facilities to the transferee, the transferee shall be solely responsible for the ongoing compliance with Sections IV and VI of the Consent Decree and URO shall be relieved of its obligations under the Consent Decree. At least 30 Days prior to any such transfer of ownership or operation of a Facility, URO shall provide a copy of this Consent Decree to the proposed transferee and shall simultaneously provide written notice of the prospective transfer, together with a copy of the relevant portions of the proposed written agreement and a demonstration of the proposed transferee's technical and financial ability to comply with the obligations of the Consent Decree, to EPA Region 5 and the United States Department of Justice, in accordance with Section XIII (Notices). Any attempt to transfer ownership or operation of the Facilities without complying with this Paragraph constitutes a violation of this Consent Decree.

6.      URO shall provide a copy of this Consent Decree to all officers, employees, and agents whose duties might reasonably include compliance with any provision of this Decree, as well as to any contractor retained to perform work required under this Consent Decree. URO shall be responsible for ensuring that all employees and contractors involved in performing any work pursuant to this Consent Decree perform such work in compliance with the requirements of this Consent Decree.

7.      In any action to enforce this Consent Decree, URO shall not raise as a defense the failure by any of its officers, directors, employees, agents, or contractors to take any actions necessary to comply with the provisions of this Consent Decree.

2

### III.    DEFINITIONS

8.    Terms used in this Consent Decree that are defined in the CAA or in regulations promulgated pursuant to the CAA shall have the meaning assigned to them in the CAA or such regulations, unless otherwise provided in this Decree.  Whenever the terms set forth below are used in this Consent Decree, including attached appendices, the following definitions shall apply:

a.    "Active Use" shall mean a Tank System connected to one or more Active Wells. For a Tank System to be deemed "not in Active Use" under this Consent Decree, it must not be reasonably capable of receiving production from any and all Active Wells at the well pad and the liquids in each of the tanks must have been drawn down to the load lines.

b.    "Active Well(s)" shall mean a well that is capable of producing hydrocarbons through the wellhead, and where the well is currently in operation or may be restored to operation by opening valves or by energizing equipment involved in operating the well.

c.    "Certification of Completion Report" shall mean the report prepared and submitted by URO in accordance with Paragraph 15.

d.    "Closed Loop Vapor Control System" shall mean a Vapor Control System equipped with feedback control loops that continuously measure, control, and record pressure in the Tank System or tanks within the Tank System by controlling the production equipment upstream of the Tank System. A Closed Loop Control System automatically regulates hydrocarbon flow to the Tank System, thereby controlling the vapor flow rate, duration, and frequency to maintain Vapor Control System pressure below the Leak Point of the Vapor Control System pressure relief device(s) as described in the Closed Loop Design Guideline.

e.    "Complaint" shall mean the complaint filed by the United States in this action.

f.    "Compromised Equipment" shall mean equipment associated with a Vapor Control System that is beginning to show signs of wear beyond normal wear, and that cannot be addressed by cleaning the equipment. Examples include, but are not limited to, cracks or grooves in gaskets, abnormally or heavily corroded equipment, and beveling or other indications of inefficient connection of the thief hatch to the tank.

g.    "Consent Decree" or "Decree" shall mean this Consent Decree and all appendices hereto.

h.    "Day" shall mean a calendar day.  In computing any period of time under this Consent Decree, where the last day would fall on a Saturday, Sunday, or federal holiday, the period shall run until the close of business of the next working day.

i.    "Effective Date" shall have the definition provided in Section XIV (Effective Date).

3

j.    "EPA" shall mean the United States Environmental Protection Agency and any successor departments or agencies.

k.    "Facilities" or "Subject Facilities" shall mean URO's oil and natural gas production facilities listed in Appendix 1.

l.    "IR Camera" shall mean an optical gas imaging infrared camera designed for, and capable of, detecting hydrocarbon and VOC emissions.

m.    "IR Camera Inspection" shall mean an inspection of a Vapor Control System using an IR Camera that is conducted by trained personnel who maintain proficiency through regular use of an IR Camera.

n.    "Leak Point" shall mean the lowest pressure at which emissions are released from any pressure relief devices, including thief hatches, on a Vapor Control System. The Leak Point may be determined by measurement of the Vapor Control System pressure during pressurization of the Vapor Control System, noting the lowest pressure at which emissions are observed from any Vapor Control System pressure relief device during the field survey. For purposes of establishing the Leak Point for a Closed Loop Control System, the value of the Leak Point must not exceed the lowest rated pressure at which any Vapor Control System pressure relief device is designed to open or relieve pressure.

o.    "Malfunction" shall mean any sudden, infrequent, and not reasonably preventable failure of air pollution control equipment, process equipment, or a process to operate in a normal or usual manner. Failures that are caused in part by poor maintenance or careless operation are not malfunctions.

p.    "Normal Operations" shall mean all periods of operation, excluding Malfunctions. For storage tanks at well production facilities, Normal Operations include, but are not limited to, liquid dumps from the Separator.

q.    "Open Loop Engineering Design Standard" shall mean the engineering design methods, equations, and information used to evaluate the capacity and operation of each Open Loop Vapor Control System, the control device(s), and vapor recovery unit consistent with the operational parameters (e.g., manufacturer specifications) and the size and design of the Vapor Control System, including piping, pressure relief valves, and available tank headspace.

r.    "Open Loop Modeling Guideline" shall mean the engineering model used to estimate the Potential Minimum Instantaneous Vapor Flow Rate and the Potential Peak Instantaneous Vapor Flow Rate as specified in Paragraph 10. The guideline should consider pressurized hydrocarbon liquid and natural gas samples, equipment inventories, separation equipment operating conditions, and well production rates to model the process flow rates, while incorporating the volume, frequency, and duration of individual dump events or transfers to the atmospheric storage tanks.

s.    "Open Loop Vapor Control System" shall mean a Vapor Control System that is not a Closed Loop Vapor Control System.

4

t.     "Paragraph" shall mean a portion of this Consent Decree identified by an Arabic numeral.

u.     "Parties" shall mean the United States and URO.

v.     "Potential Minimum Instantaneous Vapor Flow Rate" shall mean the minimum instantaneous rate of vapors routed to a Vapor Control System during Normal Operations, including flashing, working, and standing losses, as determined using the Open Loop Modeling Guideline developed pursuant to Paragraph 10.

w.     "Potential Peak Instantaneous Vapor Flow Rate" shall mean the maximum instantaneous rate of vapors routed to a Vapor Control System during Normal Operations, including flashing, working, and standing losses, as determined using the Open Loop Modeling Guideline developed pursuant to Paragraph 10.

x.     "PRV" shall mean a pressure relief valve or pressure relief device.

y.     "PTIO" or "PTIOs" shall mean the Ohio Permits to Install and Operate for URO's oil and natural gas production facilities listed in Appendix 1.

z.     "Reliable Information" shall mean any observance or detection of VOC emissions from a Tank System, any associated open-ended line (e.g., vent line, blowdown valve or line), or any associated pressure relief device by means of an optical gas imaging infrared camera, EPA Method 21 monitoring, or audio, visual, olfactory ("AVO") techniques by EPA, the Ohio Environmental Protection Agency (OEPA), local government inspectors, URO employees, or URO contractors trained to conduct inspections for emissions. This includes Compromised Equipment resulting in any observance or detection of VOC emissions attributable to PRVs, thief hatches, mountings, or gaskets during a field survey or other Tank System site visit performed in accordance with this Consent Decree. As to combustion devices used in a Vapor Control System, Reliable Information shall also include any observance or detection of Visible Smoke Emissions by EPA, the State, local government inspectors acting as duly designated representatives of the State, URO employees, or URO contractors trained to conduct inspections for emissions. Reliable Information may be obtained at any time. Observations from a Tank System while all wells associated with that Tank System are temporarily shut-in, and during which working and standing emissions may occur, will not be considered Reliable Information. Further, observations from a Tank System while pressure relief devices (e.g., thief hatches) are open for active maintenance, well unloading, tank truck loadout, or gauging activities shall also not be considered Reliable Information.

aa.     "Section" shall mean a portion of this Consent Decree that has a heading identified by an upper case Roman numeral.

bb.     "Separator" shall mean a pressurized vessel used for separating a well stream into gaseous and liquid components.

cc.     "State" shall mean the State of Ohio, including but not limited to OEPA.

5

dd. "Subparagraph" shall mean a portion of a Paragraph of this Consent Decree identified by a lowercase letter or lowercase roman numeral.

ee. "SOP" shall mean standard operating procedure.

ff. "Tank System(s)" shall mean one or more atmospheric tanks that store hydrocarbon liquids and any other interconnected tank (e.g., produced water tank) that share a common Vapor Control System. The Tank Systems that are subject to the specified requirements of this Consent Decree are identified in Appendix 1.

gg. "United States" shall mean the United States of America, acting on behalf of EPA.

hh. "Vapor Control System" shall mean the system used to contain, convey, and control vapors from one or more storage tank(s), including flashing, working, and standing losses, as well as any emissions routed to the tank Vapor Control System. A Vapor Control System includes a Tank System, piping to convey vapors from a Tank System to a control device or vapor recovery unit, fittings, connectors, liquid knockout vessels, openings on tanks (e.g., pressure relief valves and thief hatches), and emission control devices.

ii. "VCS Root Cause Analysis" shall mean an assessment conducted through a process of investigation to determine the primary cause and contributing cause(s), if any, of VOC emissions from a Vapor Control System.

jj. "Visible Smoke Emissions" shall mean observations of smoke for any period or periods of duration greater than or equal to one (1) minute in any fifteen (15) minute period during Normal Operations, pursuant to EPA Method 22. Visible smoke emissions do not include radiant energy or water vapor.

kk. "VOC" or "VOCs" shall mean volatile organic compounds.

ll. "Well Production Operations" shall mean surface operations to produce hydrocarbon liquids or natural gas from a well, but shall not include well maintenance activities (e.g., swabbing).

## IV.    COMPLIANCE REQUIREMENTS

### A.    General Compliance Requirements

9. Compliance with Subparts OOOO and OOOOa and the PTIOs. URO shall comply with all requirements of Subparts OOOO and OOOOa, applicable to each of the Tank Systems. In addition, URO shall comply with the individual PTIOs applicable to each of the Subject Facilities.

### B.    Vapor Control Systems Modeling and Engineering Design

6

10.    Open Loop Modeling Guideline or Closed Loop Design Guideline.  On August 18, 2022, EPA approved URO's Open Loop Modeling Guideline or Closed Loop Design Guideline for all Vapor Control Systems subject to this Consent Decree.

a.    The Open Loop Modeling Guideline shall determine the Potential Minimum Instantaneous Vapor Flow Rate and the Potential Peak Instantaneous Vapor Flow Rate for designing and adequately sizing Vapor Control Systems and to provide procedures for achieving this objective. The Open Loop Modeling Guideline shall address the following, where relevant.

i.      Vapor sources (e.g., atmospheric storage tanks and transfer and loading systems) tied or to be tied into the Vapor Control System;

ii.     The maximum operating pressure from the last stage of separation prior to the Tank System to which the Vapor Control System is certified for operation in accordance with Paragraph 17;

iii.    Vapor pressure of the final product transported from the storage tank(s);

iv.     Estimation of flash gas that reflects the highest potential for flash gas emissions utilizing pressurized or atmospheric liquid sampling (e.g., API gravity), lab analyses including flash gas to oil ratio, process simulation, correlations, or any combination thereof;

v.      The maximum design flow rate across the Separator liquid dump valve (reflective of valve size, trim, and presence of other restrictions);

vi.     Simultaneous dump events to the same Tank System (unless all potential simultaneous dump events have been precluded through installation of timers, automation, or other measures);

vii.    The calculation methods or simulation tools for processing the data inputs;

viii.   The accuracy of the input data and results (e.g., uncertainty of empirical correlations, representativeness of samples, additional assumptions made); and

ix.     Any other inputs needed to estimate the Potential Minimum Instantaneous Vapor Flow Rate and Potential Peak Instantaneous Vapor Flow Rate (e.g., ranges of process conditions and operating parameters.

b.    The Closed Loop Design Guideline shall describe the steps necessary to design, install, verify, and operate a Closed Loop Vapor Control System by reading tank pressures and automatically controlling liquid flow and vapor flow to the tanks, thereby ensuring

7

tank pressure does not exceed the Leak Point. The Closed Loop Design Guideline must also describe the steps used to demonstrate that the control device and vapor recovery unit have sufficient capacity to handle the peak vapor flow rate from the Tank System at Leak Point pressure and are operated above their minimum inlet pressure at all times.

      c.    URO may periodically update the Open Loop Modeling Guideline or develop a Closed Loop Design Guideline as appropriate. Should the Guideline(s) be updated, the use of the version current at the time of the engineering evaluation is acceptable. Updates to the Guideline(s) do not in and of themselves require URO to redo engineering evaluations.

      11.    <u>Open Loop Engineering Design Standards</u>.

      a.    On August 18, 2022, EPA approved URO's Open Loop Engineering Design Standards for Vapor Control Systems, which assessed the size and operation of the Vapor Control Systems. The Open Loop Engineering Design Standards includes, as appropriate:

        i.    A review of vapor control technologies applicable to the Tank System, including equipment-specific considerations and any associated pressure losses (e.g., from flame arrestor);

        ii.    Identification of site-specific construction constraints (e.g., footprint limitations, setbacks, maximum equipment counts);

        iii.    Size and design of the piping system between the tank(s) and the emission control device, and the size and design of the emission control device (including consideration of equivalent pipe length and back pressure valves or other restrictions on vapor flow);

        iv.    Volume and duration of individual dump events; the nature of the flow of liquids to the Separator (i.e., steady flow, slug flow, intermittent flow (e.g., due to discrete well cycling events)); the minimum time between dump events; and the maximum number of dump events associated with a single well cycle with slug or intermittent flow;

        v.    Minimum available headspace in the tank(s);

        vi.    Engineering design considerations applied to account for issues associated with the Vapor Control System (e.g., fouling, potential for liquids accumulation in lines, winter operations) and variability of data.

      b.    URO may rely on manufacturer specifications for individual components or pieces of equipment that are part of a Vapor Control System, provided that any operating parameters prescribed by the manufacturer in order for the component or piece of equipment to function as designed are met.

8

c.     The Open Loop Engineering Design Standard(s) may apply to Vapor Control Systems at individua l Tank Systems or to groupings of Tank Systems as URO may determine appropriate.

## C.     <u>Vapor Control Systems Field Surveys and Engineering Evaluation</u>

12.     <u>Vapor Control System Field Survey SOP</u>. URO shall develop a written SOP establishing how URO will conduct its Vapor Control System field surveys under this Consent Decree. The Vapor Control System Field Survey SOP shall include:

a.     Procedures to inventory and verify the installation and proper operation of the equipment associated with the Vapor Control System; and

b.     Procedures for evaluating all Vapor Control System components, including all pressure relief valves, thief hatches, mountings, and gaskets at each tank in the Tank System, and the possibility of upgrading this equipment to reduce the likelihood of VOC emissions.

13.     <u>Vapor Control Systems Field Survey</u>.

a.     By no later than 60 Days after the Effective Date, for each Tank System, URO shall conduct a field survey in accordance with Vapor Control System Field Survey SOP. For Closed Loop Vapor Control Systems, URO shall demonstrate that the Closed Loop Vapor Control System actively controls tank pressures based on all control points and an IR Camera verification of the Leak Point in a manner consistent with the Closed Loop Design Guideline.

b.     During the field survey of an Open Loop Vapor Control System, URO shall evaluate the condition and appropriateness of all PRVs, thief hatches, mountings, and gaskets at each tank in the Tank System, and the possibility of upgrading such equipment to reduce the likelihood of VOC emissions. This evaluation shall include the following actions:

i.     URO shall ensure that every thief hatch is either welded or mounted to the tank with a suitable gasket that is properly installed in order to prevent emissions at the tank attachment point; and

ii.     If while evaluating the PRVs, thief hatches, mountings, and gaskets, URO observes Compromised Equipment or evidence of VOC emissions attributable to such PRVs, thief hatches, mountings, or gaskets, URO shall repair, replace, or upgrade such equipment, as appropriate.

14.     <u>Vapor Control Systems Engineering Evaluation</u>.

a.     By no later than 150 Days after the Effective Date, after conducting the field survey described in Paragraph 13, URO shall conduct an engineering evaluation for each Vapor Control System at each Tank System to ensure all Vapor Control System emissions are routed to a control device or a process, as described in this Paragraph.

9

      i.     For each Tank System that uses an Open Loop Vapor Control System, the engineering evaluation shall ensure that the Vapor Control System is adequately designed and sized to handle the Potential Minimum Instantaneous Vapor Flow Rate and Potential Peak Instantaneous Vapor Flow Rate that was calculated through the application of the Open Loop Modeling Guideline and Open Loop Engineering Design Standard (see Paragraphs 10 and 11).

      ii.    For each Tank System that uses a Closed Loop Vapor Control System, the engineering evaluation shall ensure all necessary hardware and software to create and operate the Closed Loop Vapor Control System is installed and operating in a manner consistent with the Closed Loop Design Guideline.

15.    <u>Vapor Control Systems Field Survey and Engineering Evaluation Certification of Completion Report</u>. URO shall complete and submit to EPA with the Semi-Annual Report due following the deadline in Subparagraph 17.b the following information as a Certification of Completion Report, in a spreadsheet or database format: (i) the Engineering Design Standard (which could be for an individual Tank System) that was used for each Vapor Control System; (ii) the result of the engineering evaluation, including identification of any changes made to equipment and/or operation as a result of the engineering evaluation; (iii) identification of site-specific or system-wide operational parameters or practices relied upon in the engineering evaluation (e.g., maximum operating pressure for final stage of separation, measures to preclude simultaneous dump events, minimum available headspace in tanks); (iv) the minimum Tank System thief hatch or PRV setting and the calculated maximum pressure modeled in the Tank System in ounces per square inch; and (v) the date an IR Camera Inspection was completed pursuant to Paragraph 17 and the results of such inspection.

### D.    **Vapor Control Systems Modifications**

16.    <u>Vapor Control System Modifications and Compromised Equipment</u>. For those Vapor Control Systems that are not adequately designed or sized based on the engineering evaluation pursuant to Paragraph 14, URO shall:

    a.    Make all necessary modifications in accordance with the engineering evaluation and field survey to:

      i.     Increase the capacity of the Vapor Control System to handle the Potential Peak Instantaneous Vapor Flow Rate in accordance with a revised Engineering Design Standard; or

      ii.    Reduce the Potential Peak Instantaneous Vapor Flow Rate (as calculated, accounting for modifications, using the Open Loop Modeling Guideline); or

      iii.   Ensure Tank System pressures do not exceed the Leak Point in accordance with a revised Closed Loop Design Guideline.

10

b. Make all necessary modifications to ensure that the control device(s) and vapor recovery unit(s) operate within manufacturer specifications for the device's size and design, in accordance with the Open Loop Engineering Design Standards or the Closed Loop Design Guideline.

c. If URO has not completed an Engineering Evaluation for a Tank System and made necessary modifications by the applicable deadline, URO shall shut-in all Well Production Operations associated with that Tank System by such deadline until the requirements of Paragraphs 14 and 16 are met.

d. If URO has not completed an Engineering Evaluation by the applicable deadline because Well Production Operations are temporarily shut-in, URO shall – for the sole purpose of (i) undertaking an Engineering Evaluation at a Tank System, (ii) making necessary modifications pursuant to Paragraph 16, or (iii) taking corrective actions pursuant to Paragraph 21 – be allowed to resume Well Production Operations associated with that Tank System for a period not to exceed five (5) Calendar Days. Upon EPA written approval, the period of resumed Well Production Operations associated with a Tank System may be extended for up to five (5) additional Calendar Days.

e. Fix or replace Compromised Equipment associated with the Vapor Control System that may be causing VOC emissions.

f. URO shall complete the requirements of Paragraph 16 for all Tank Systems by no later than 210 Days after the Effective Date.

17. <u>Control System Modifications Verification and Completion Deadline</u>.

a. Within 30 Days of the Effective Date, URO shall develop a written SOP identifying procedures for conducting an IR Camera Inspection of the Vapor Control System during Normal Operations, including while and immediately after hydrocarbon liquids are being sent to the Tank System from all associated Well Production Operations. URO shall verify and ensure that each Vapor Control System that has been modified pursuant to Paragraph 16 is adequately designed and sized through application of an Open Loop Engineering Design Standard or Closed Loop Design Guideline, and that equipment associated with the Vapor Control System is not causing VOC emissions. URO shall conduct a verifying IR Camera Inspection – consistent with the IR Camera SOP – demonstrating that after completion of the modifications pursuant to Paragraph 16, the Vapor Control System is adequately designed and that equipment associated with the Vapor Control System is not causing VOC emissions detected with an IR Camera while and immediately after hydrocarbon liquids are being sent to the Tank System from all associated Well Production Operations. For any Tank System where VOC emissions are detected with an IR Camera during the verifying IR Camera Inspection conducted pursuant to this Paragraph, URO will address the emissions via the Reliable Information requirements of Paragraph 21 and will determine if any additional modifications are necessary pursuant to Paragraph 16.

b. URO shall complete all requirements of Paragraph 17 by no later than 240 Days after the Effective Date.

11

18.     Post-Certification of Completion Modifications.  If, after URO has submitted to EPA a Certification of Completion Report under Paragraph 15 for a Tank System, URO determines that a specific Vapor Control System design needs to be modified to address Reliable Information or meet the Performance Standards (Paragraph 19) in this Consent Decree, URO shall evaluate whether similar modifications are necessary at other Vapor Control Systems using the same Engineering Design Standard. URO shall submit in the next required Semi-Annual Report: (i) a summary of any evaluations of whether modifications were necessary at other Vapor Control Systems; and (ii) the timing, results, locations, and description of any modifications of other Vapor Control Systems or a timeline for the completion of such modifications.

### E.     Performance Standards, Preventative Maintenance, and Corrective Action

19.     Performance Standards. Following the completion of the engineering evaluation(s) in Paragraph 14 and any necessary modifications at a Vapor Control System under Paragraph 16, URO shall:

a.     Operate and maintain air pollution control equipment consistent with manufacturer specifications and good engineering and maintenance practices and shall keep manufacturer specifications on file;

b.     Ensure that all air pollution control equipment is adequately designed, sized, and operated to achieve at least a 95% control efficiency for VOCs and to handle reasonably foreseeable fluctuations in emissions of VOCs (fluctuations in emissions that occur when a Separator dumps into the tank are reasonably foreseeable);

c.     Ensure that all condensate collection, storage, processing, and handling operations, regardless of size, are designed, operated, and maintained so as to minimize emissions of VOCs to the atmosphere to the maximum extent practicable; and

d.     Comply with all requirements of Subparts OOOO and OOOOa applicable to each of the Tank Systems and with the individual PTIOs applicable to each of the Subject Facilities, as required by Paragraph 9.

20.     Directed Inspection and Preventative Maintenance Program.  By no later than 120 Days after the Effective Date, URO shall develop and submit to EPA, for review and approval in accordance with Section IV.J., a plan for a directed inspection and preventative maintenance ("DI/PM") program.  EPA shall complete its review of the DI/PM plan within 60 days of receipt. URO shall implement the DI/PM program at each Tank System, and associated Well Production Operations equipment, by no later than 210 Days after the Effective Date. URO is not required to implement the requirements of Subparagraphs 20.a through 20.c at a well pad where all Tank Systems are not in Active Use and remain not in Active Use, so long as URO performs the Subparagraph 20.c actions prior to returning one or more Tank System(s) to Active Use and performs the actions specified within Subparagraphs 20.a and 20.b within seven (7) days of returning one or more Tank Systems to Active Use. As part of the DI/PM program, URO shall:

a.  Address system-wide inspection, response, and preventative maintenance procedures for the Vapor Control Systems, including without limitation:

i.  Monthly AVO walk-around inspection of all Tank Systems to check for VOC emissions and abnormal operating conditions, including checking for hissing, significant new staining, visible liquid droplets, evidence of a spill, or other indicators of emissions or operational abnormalities. URO shall develop an SOP for the AVO walk-around inspection. The SOP will define the "audio," "visual," and "olfactory" components of AVO inspections, and will specify optimal operational set points (or optimal ranges of operating parameters) of equipment, where applicable, to assist in training of the personnel who will conduct these inspections. This SOP should be informed by the results of engineering evaluations performed by URO. The AVO walk-around inspection will check the following, where relevant:

1.  Separators – whether the Separator was properly operating at time of inspection, whether the dump valve was operating properly as observed from outside, any corrective actions made to dump valve(s), and Separator operating pressure and any other established operating parameter set points.

2.  Tank System – PRVs are properly sealed; thief hatches are closed, latched, and properly sealed; other valves are in the correct position; and absence of other abnormal AVO or IR Camera observations in tank piping (e.g., load line, blowdown line, etc.).

3.  Vapor Control System – combustion device checks for proper operation of emission control device (e.g., correct valve positions, normal operating pressures where indicators are present), presence of a pilot light, draining of liquids from knock-out vessel, and auto-ignitor properly functioning.

ii.  Monthly IR Camera Inspections of Separators, Tank Systems, and Vapor Control Systems, following the IR Camera Inspection SOP established under Subparagraph 17.a.

b.  Include any site-specific or system-wide parameters or practices relied upon in the verification of a Vapor Control System and ensure that such parameters or practices are readily identified and available to URO's field personnel while on location (via on-site labeling, forms provided to personnel, URO's field data collection software, or other readily available means) and verified during the monthly AVO and IR Camera inspections required by this Paragraph.

c.  Establish and implement procedures for preventive maintenance, including evaluation of equipment performance to identify appropriate long-term maintenance and

13

inspection schedules and a replacement program (e.g., replacement of "wear" equipment and periodic maintenance schedules to prevent diminished control efficiencies). URO shall propose initial maintenance and inspection schedules and a replacement program in the DI/PM program, along with an SOP (informed by the results of the engineering evaluations performed by URO) for such activities indicating specific equipment and inspection/work to be performed, which includes, but is not limited to:

    i.    Check PRV and thief hatch seals and gaskets for integrity, replace any Compromised Equipment, check proper operation of dump valve on Separator, and perform other appropriate maintenance and inspection activities. These activities shall occur no less frequently than quarterly. This SOP should be informed by the results of engineering evaluations performed by URO.

    ii.    Check that Separator dump valve orifices, where present, are in good condition and replace as necessary, clean flame arrestor (replacing as appropriate), check and clean burner tray (replace as appropriate), and blow out vent lines to address liquids that may have accumulated. This shall occur no less frequently than semi-annually. URO may elect to modify the Vapor Control System vent lines accordingly to eliminate the potential for liquids accumulation and then may submit to EPA a request to reduce the frequency of or eliminate the blowing out of vent lines. EPA may grant or deny URO's request in whole or in part. EPA's decision to grant or deny URO's request is subject to the Dispute Resolution procedures in Section IX.

    iii.    URO shall perform maintenance, repair, replacement, upgrade, or other corrective action, as appropriate.

    d.    Maintain a spare parts program adequate to support normal operating, maintenance, and replacement requirements, establish written procedures for the acquisition of parts on an emergency basis (e.g., vendor availability on a next-day basis), and evaluate appropriate parts to be kept on hand for pumpers and emissions crew (e.g., thief hatch gaskets and seals on trucks and PRVs at a central facility). At all times during the pendency of this Consent Decree, URO shall ensure that a current employee has been designated with the responsibility for maintaining the adequacy of the spare parts inventory. The spare parts inventory may be based initially on vendor recommendations.

    e.    Establish and implement requirements for appropriate documentation of compliance with DI/PM practices and procedures (by Tank System) so that the Parties can verify that the DI/PM program is being implemented. This includes creating and maintaining documentation of maintenance, inspection, repair, replacement, upgrade, and other corrective action work. Activities identified within the DI/PM plan as being performed on a regular basis that are not a direct result of finding Compromised Equipment may not be considered "corrective action" work for purposes of this Subparagraph. In addition, activities responsive to Reliable Information are always considered "corrective action" work for purposes of this Subparagraph.

Any activities excluded from "corrective action" work should be described in the DI/PM program.

f.     Ensure that all persons (employees and contractors) responsible for implementation or execution of any part of the DI/PM program, except for independent contractors solely responsible for servicing equipment (e.g., combustor manufacturer personnel replacing a burner tray), have completed training on the aspects of the DI/PM program, including any SOPs, which are relevant to the person's duties. URO shall develop and document a training protocol to ensure that refresher training is performed once per calendar year and that new personnel are sufficiently trained prior to any involvement in the DI/PM program. Both refresher and new personnel training will include a job shadowing program in addition to training materials such as written, online, or classroom instruction.

g.     Commencing in 2023, for each Tank System, URO shall perform the following evaluation during each calendar year.

i.     A DI/PM program-trained employee or contractor of URO, whose primary responsibilities do not include performing duties in the DI/PM program on a routine basis for the particular Tank System under evaluation, shall undertake the following at each Tank System, and associated Well Production Operations equipment, in consultation with persons performing DI/PM program duties for that particular Tank System:

1.  Verify that maintenance and inspection schedules and the replacement program have been followed at the appropriate frequency;

2.  Review maintenance and corrective action work records to confirm proper recordkeeping, timely response to all issues (e.g., emissions or other operational issues), and determine if there are recurrent or systemic issues associated with a particular Tank System; and

3.  Make any appropriate updates to the DI/PM program, including SOPs.

ii.    Upon completion of review of all Tank Systems, URO shall evaluate whether there are recurrent or systemic issues across URO's Tank Systems.

iii.   If URO determines that actions need to be taken to address operations or maintenance activities at one or more Tank Systems based on URO's review (as described above), such as making appropriate updates to the DI/PM program, including SOPs, URO shall take such actions as soon as practicable.

15

iv.    The evaluations under this Subparagraph 20.g shall be completed by July 1 of each calendar year (starting with 2024) and shall be based on a review of records from the previous calendar year.

v.     With the Semi-Annual report following the completion of the review described above, URO shall submit documentation of the following information: (a) the date that review of the Tank System was completed; (b) the nature and timing of any modifications or corrective actions as a result of this review; and (c) a discussion of whether URO identified any systemic issues and if so, what actions URO is taking to address those issues.

21.    <u>Reliable Information, Investigation, and Corrective Action</u>. Within five Days after URO obtains any Reliable Information, including, but not limited to, observances or detections during inspections required by Subparagraph 17.a (Verification), Paragraph 20 (Directed Inspection and Preventative Maintenance Program), and Paragraph 22 (Tank Pressure Monitoring), URO shall either (i) complete all necessary corrective actions to address the Reliable Information or (ii) temporarily shut-in Well Production Operations associated with the Tank System. If the Reliable Information can be addressed by isolation of one or more tanks in a Tank System, shutting in one or more wells or Separators, or other similar action, such action may be an acceptable corrective action to meet the deadline in this Paragraph if completed within such deadline.

a.     For each Tank System with associated Well Production Operations temporarily shut-in pursuant to the requirements of this Paragraph, URO shall proceed as follows:

i.     If the Tank System has not yet undergone an engineering evaluation, Well Production Operations shall remain shut-in until the engineering evaluation and any necessary modifications have been completed, and URO shall comply with the requirements of Subparagraph 17.a (Verification) at that Tank System within 60 Days of resuming any Well Production Operations associated with that Tank System.

ii.    If the Tank System has already undergone an engineering evaluation, Well Production Operations shall remain shut-in until completion of any necessary modifications, including, if appropriate, a re-evaluation of the Vapor Control System and engineering evaluation. URO shall comply with the requirements of Subparagraph 17.a (Verification) at that Tank System within 60 Days of resuming any Well Production Operations associated with that Tank System.

b.     For each Tank System with associated Well Production Operations temporarily shut-in pursuant to the requirements of this Paragraph, URO shall provide to EPA in a spreadsheet the following:

16

       i.      The date Reliable Information was obtained resulting in a temporary shut-in;

       ii.     The date that such Well Production Operations were temporarily shut-in;

       iii.    The date modifications were made, including a description of the modifications;

       iv.    The date that Well Production Operations were resumed; and

       v.     The date post-repair/engineering evaluation that an IR Camera Inspection was completed, and the results of that inspection.

c.     For each instance where URO obtains Reliable Information – and within the five-Day deadline provided in this Paragraph above, completes all necessary corrective actions to address the emissions – URO shall provide to EPA in a spreadsheet the following:

       i.      The Tank System identifier;

       ii.     The date Reliable Information was obtained; and

       iii.    The date(s) all necessary corrective actions to address the emissions were made, including a description of such actions.

d.     URO shall attach copies of the spreadsheets required by this Paragraph to the next Semi-Annual Report that follows at least 30 Days after all necessary corrective actions to address the emissions were made or any required IR Camera Inspection was completed.

e.     If URO obtains three or more instances of Reliable Information related to any single Tank System in any rolling six-month period, URO shall complete within 90 Days a VCS Root Cause Analysis and identify any appropriate response actions to be taken to address any common operation, maintenance, or design cause(s) identified, along with a proposed schedule for the implementation of those response actions. Appropriate response actions may include proactive solutions to maintenance problems.

       i.      In the next Semi-Annual Report, URO shall submit the results of each VCS Root Cause Analysis, including the proposed timeline for response actions if those are not already completed at the time of the submission of the VCS Root Cause Analysis results.

       ii.     Additional instances of Reliable Information at a Tank System at which URO is currently performing a VCS Root Cause Analysis shall be added as additional information in that VCS Root Cause Analysis, but shall not trigger additional VCS Root Cause Analyses until URO has completed the ongoing VCS Root Cause Analysis.

F. **Tank Pressure Monitoring**

22. By no later than twelve months from the Effective Date, URO shall, at the Subject Facilities listed in Appendix 1, install, calibrate (in accordance with manufacturer recommendations, if available), operate, and maintain pressure monitors on each Tank System that uses an Open Loop Vapor Control System. The monitors shall be linked to and continuously monitored (i.e., one measurement every five (5) minutes with a data transmission every five (5) minutes) by a central monitoring location in accordance with the requirements of this Paragraph.

a. For the first six months after the deadline for installation of pressure monitors, URO shall have a performance optimization period to evaluate calibration and optimize pressure monitor performance and reliability. This period will allow URO, and its contractors or pressure monitor vendors, an opportunity to ensure that the pressure monitors, to the greatest extent practicable, are producing quality data that may be used to identify the potential for over-pressurization of Tank Systems (e.g., optimization of pressure monitor location on a Tank System, determination of pressure measurements and frequency indicative of potential for over-pressurization).

b. Following the performance optimization period, if a pressure monitor measurement exceeds the "trigger point" at a Tank System, URO shall conduct a site investigation. Measurements at a Tank System while all wells associated with that Tank System are temporarily shut-in, and during which working and standing emissions may occur, will not trigger a site investigation. Multiple pressure monitor measurements in exceedance of the "trigger point" in one Day will result in only one site investigation. The investigation shall include a site visit to check the pressure monitor and the operating parameters of the associated Tank System ("Site Investigation"). During the Site Investigation, URO shall conduct an IR Camera Inspection of the Tank System. The Site Investigation shall be completed no later than the end of the calendar Day following the measurement that exceeded the "trigger point." For purposes of this Paragraph, "trigger point" means the lowest set point of any device designed to relieve pressure from a tank in a Tank System, minus two ounces. Set point refers to the pressure (in ounces) at which a device is designed to relieve pressure. For example, if a tank is equipped with a PRV and a thief hatch and the set point of the PRV is 14 ounces and the set point of the thief hatch is 16 ounces, the "trigger point" would be 12 ounces (i.e., the lowest set point of any device on the tank minus two ounces). For the avoidance of doubt, a single "trigger point" exceedance or multiple "trigger point" exceedances in one Day will require a Site Investigation, as described above, but will not require a VCS Root Cause Analysis. In the event a Tank System requires three Site Investigations in a consecutive 30 calendar Day period, URO shall conduct a VCS Root Cause Analysis within 90 Days and identify appropriate response actions to be taken to address any common operation, maintenance, or design cause(s) identified, along with a proposed schedule for the implementation of those response actions. Appropriate response actions may include proactive solutions to maintenance problems. Additional Site Investigations at a Tank System at which URO is currently performing a VCS Root Cause Analysis shall be added as additional information in that VCS Root Cause Analysis, but shall not trigger additional VCS Root Cause Analyses until URO has completed the ongoing VCS Root Cause Analysis.

c.      URO shall maintain records of the following and this information shall be provided in a spreadsheet (unless the Parties agree in writing to a different format) with each Semi-Annual Report: (i) the date, time, location, and numerical value of all pressure readings in excess of the trigger point, and (ii) the date and results of all corresponding Site Investigations and all corresponding VCS Root Cause Analyses, along with the timeline for response actions identified if not already completed.

d.      At any time, URO may submit to EPA a request for alternative criteria triggering a Site Investigation and/or VCS Root Cause Analysis. EPA may grant or deny URO's request in whole or in part.

### G.      Effect of Plug and Abandonment

23.      The permanent plug and abandonment of a well shall be deemed to satisfy all requirements of this Consent Decree applicable to the well and associated equipment no longer servicing wells that have not been plugged and abandoned on and after URO's filing of a plugging report with the Ohio Department of Natural Resources pursuant to O.A.C. Rule 1501:9-11-12. Once URO has decided to permanently plug and abandon a well under this Paragraph, no Well Production Operations shall be permissible unless as required to prepare the well for plug and abandonment. URO shall maintain copies of all documentation required by this Paragraph for inspection and review by EPA. In each Semi-Annual Report, URO shall update Appendix 1 to reflect any wells and associated Tank Systems that have been permanently plugged and abandoned. Nothing herein shall preclude URO from reusing any equipment from a plugged and abandoned well.

### H.      Mitigation

24.      URO shall implement the following measures designed to reduce future VOC and methane emissions from its facilities:

a.      Thief Hatch Upgrades.  By January 1, 2023, URO shall replace 102 existing tank thief hatches with lower leak rate models with leak rates of 0.1 scf/hr or less at the following facilities: Neill, Garvin, Palmer, Mason, Miley, Onega, Detweiler, Stiers, Cole, Dynamite, Neff, Cunningham, Johnson, and Rubel.

b.      Pneumatic Retrofits.  By April 1, 2023, URO shall convert 466 existing pneumatic controllers at the Subject Facilities to non-emitting pneumatic air controllers and re-route 43 existing pneumatic controllers at the Subject Facilities to a vapor recovery unit or combustion device.

c.      Engine Electrification.  By August 1, 2023, URO shall connect the following facilities to the electric grid and replace all existing natural gas-driven engines with electric motors: Beros, Johnson, Neff, Onega, and Rubel.

25.      Mitigation Completion Report.  By no later than 60 Days following the completion of all measures required by Paragraph 24, URO shall submit to EPA a Mitigation

Completion Report that documents the dates, locations, and exact numbers for the equipment upgrades performed by URO.

### I.     Permits

26.     Where any compliance obligation under this Section requires URO to obtain a federal, state, or local permit or approval, URO shall submit timely and complete applications and take all other actions necessary to obtain all such permits or approvals.  URO may seek relief under the provisions of Section VIII (Force Majeure) for any delay in the performance of any such obligation resulting from a failure to obtain, or a delay in obtaining, any permit or approval required to fulfill such obligation, if URO has submitted timely and complete applications and has taken all other actions necessary to obtain all such permits or approvals.

### J.     Approval of Deliverables

27.     After review of any plan, report, or other item that is required to be submitted for approval pursuant to this Consent Decree, EPA shall in writing: (a) approve the submission; (b) approve the submission upon specified conditions; (c) approve part of the submission and disapprove the remainder; or (d) disapprove the submission.

28.     If the submission is approved pursuant to Paragraph 27, URO shall take all actions required by the plan, report, or other document, in accordance with the schedules and requirements of the plan, report, or other document, as approved.  If the submission is conditionally approved or approved only in part pursuant to Paragraph 27(b) or (c), URO shall, upon written direction from EPA, take all actions required by the approved plan, report, or other item that EPA determines are technically severable from any disapproved portions, subject to URO's right to dispute only the specified conditions or the disapproved portions, under Section IX (Dispute Resolution).

29.     If the submission is disapproved in whole or in part pursuant to Paragraph 27(c) or (d), URO shall, within 45 days or such other time as the Parties agree to in writing, correct all deficiencies and resubmit the plan, report, or other item, or disapproved portion thereof, for approval, in accordance with the preceding Paragraphs.  If the resubmission is approved in whole or in part, URO shall proceed in accordance with the preceding Paragraph.

30.     Any stipulated penalties applicable to the original submission, as provided in Section VII, shall accrue during the 45 day period or other specified period, but shall not be payable unless the resubmission is untimely or is disapproved in whole or in part; provided that, if the original submission was so deficient as to constitute a material breach of URO's obligations under this Decree, the stipulated penalties applicable to the original submission shall be due and payable, subject to URO's right to invoke Dispute Resolution (Section IX), notwithstanding any subsequent resubmission.

31.     If a resubmitted plan, report, or other item, or portion thereof, is disapproved in whole or in part, EPA may again require URO to correct any deficiencies, in accordance with the preceding Paragraphs, or may itself correct any deficiencies, subject to URO's right to invoke

Dispute Resolution and the right of EPA to seek stipulated penalties as provided in the preceding Paragraphs.

## V.    CIVIL PENALTY

32.    By no later than 30 days after the Effective Date of this Consent Decree, URO shall pay to the United States a civil penalty in the amount of $1,000,000, together with interest accruing from the Effective Date, at the rate specified in 28 U.S.C. § 1961 as of the date of lodging.  URO shall pay the civil penalty by FedWire Electronic Funds Transfer ("EFT") to the U.S. Department of Justice in accordance with written instructions to be provided to URO, following the entry of the Decree, by the Financial Litigation Unit ("FLU") of the U.S. Attorney's Office for the Southern District of Ohio.  The costs of such EFT shall be URO's responsibility.  The payment instructions provided by the FLU will include a Consolidated Debt Collection System ("CDCS") number (which URO shall use to identify all payments required to be made in accordance with this Consent Decree), along with the exact amount (penalty and interest) and date due.  The FLU will provide the payment instructions via email to:

> John Swanson, President & CEO
> Utica Resource Operating, LLC
> 2167C State Route 821
> Marietta, Ohio 45750
> jswanson@uticaresource.com

URO may change the individual to receive payment instructions on its behalf by providing written notice of such change to the United States and EPA in accordance with Section XIII (Notices).  At the time of payment, URO shall send a copy of the EFT authorization form, the EFT transaction record, and a transmittal letter: (i) to EPA via email at cinwd_acctsreceivable@epa.gov or via regular mail at EPA Cincinnati Finance Office, 26 W. Martin Luther King Drive, Cincinnati, Ohio 45268 and (ii) to the United States via email or regular mail in accordance with Section XIII (Notices).  The transmittal letter shall state that the payment is for the civil penalty owed pursuant to the Consent Decree in United States v. Utica Resource Operating, LLC, and shall reference the civil action number, CDCS number, and DOJ case number 90-5-2-1-12514.

33.    URO shall not deduct any penalties paid under this Consent Decree pursuant to this Section or Section VII (Stipulated Penalties) in calculating its federal income tax.

## VI.    REPORTING REQUIREMENTS

34.    Semi-Annual Reports.  By July 31 and January 31 of each year after the Effective Date of this Consent Decree until termination of this Consent Decree, URO shall submit to EPA a progress report regarding the implementation of the requirements of this Decree in the preceding six months (i.e. January through June and July through December) ("Semi-Annual Report").  The Semi-Annual Report shall include:

> a. Work performed and progress made toward implementing the requirements of Section IV (Compliance Requirements), including completion of any milestones;

> b. Any significant problems encountered or anticipated in complying with the requirements of Section IV (Compliance Requirements), including implemented or proposed solutions;

> c. A description of any non-compliance with the requirements of this Decree and an explanation of the violation's likely cause and of the remedial steps taken, or to be taken, to prevent or minimize such violation; and

> d. Any noncompliance or deviation reports submitted during the reporting period pursuant to the individual PTIOs applicable to each of the Subject Facilities.

35. In addition to the reports required pursuant to this Section, if URO violates, or has reason to believe that it may violate, any requirement of this Consent Decree, URO shall notify the United States of such violation and its likely duration, in writing, within 10 Days of the Day URO first becomes aware of the violation, with an explanation of the violation's likely cause and of the remedial steps taken, or to be taken, to prevent or minimize such violation. If the cause of a violation cannot be fully explained at the time the report is due, URO shall so state in the report. URO shall investigate the cause of the violation and shall then submit an amendment to the report, including a full explanation of the cause of the violation, within 30 Days of the Day URO becomes aware of the cause of the violation. Nothing in this Paragraph or the following Paragraph relieves URO of its obligation to provide the notice required by Section VIII (Force Majeure).

36. Whenever any violation of this Consent Decree or any other event affecting URO's performance under this Decree, or the performance of the Facilities, may pose an immediate threat to the public health or welfare or the environment, URO shall notify EPA orally or by email as soon as possible, but no later than 24 hours after URO first knew of the violation or event. This procedure is in addition to the requirements set forth in the preceding Paragraphs.

37. All reports shall be submitted to the persons and in the manner designated in Section XIII (Notices).

38. Each report submitted by URO under this Section shall be signed by an URO official and include the following certification:

> *I certify under penalty of law that this document and all attachments were prepared under my direction or supervision in accordance with a system designed to assure that qualified personnel properly gather and evaluate the information submitted. Based on my inquiry of the person or persons who manage the system, or those persons directly responsible for gathering the information, the information submitted is, to the best of my knowledge and belief, true, accurate, and complete. I have no personal knowledge that the information submitted is other than true, accurate, and complete. I am aware that there are significant penalties for*

22

*submitting false information, including the possibility of fine and imprisonment for knowing violations.*

This certification requirement does not apply to emergency or similar notifications where compliance would be impractical.

39.     The reporting requirements of this Consent Decree do not relieve URO of any reporting obligations required by its Permit, the CAA and the rules promulgated thereunder, and any other federal, state, or local law, regulation, permit, or other requirement.

40.     Any information provided pursuant to this Consent Decree may be used by the United States in any proceeding to enforce the provisions of this Consent Decree and as otherwise permitted by law.

## VII.     **STIPULATED PENALTIES**

41.     URO shall be liable for stipulated penalties to the United States for violations of this Consent Decree as specified below, unless excused under Section VIII (Force Majeure). A violation includes failing to perform any obligation required by the terms of this Decree, including any work plan or schedule approved under this Decree, according to all applicable requirements of this Decree and within the specified time schedules established by or approved under this Decree.

42.     <u>Late Payment of Civil Penalty</u>. If URO fails to pay the civil penalty required to be paid under Section V (Civil Penalty) when due, URO shall pay a stipulated penalty of $10,000 per Day for each Day that the payment is late.

43.     The following stipulated penalties shall accrue per violation per Day for each violation of the requirements identified in Section IV (Compliance Requirements):

| Violation | Stipulated Penalties | |
|---|---|---|
| Failure to comply with Subparts OOOO and OOOOa or an individual PTIO, as provided by Paragraph 9. | Period of Noncompliance<br>Between 1 and 30 Days<br>Over 30 Days | <u>Penalty Per Violation Per Day Per Subject Facility</u><br>$500<br>$2,500 |
| Failure to develop a written Modeling Guideline as required by Paragraph 10, failure to develop Engineering Design Standards as required by Paragraph 11, or failure to develop SOPs as required by Paragraph 12. | Period of Noncompliance<br>Between 1 and 15 Days<br>Between 16 and 30 Days<br>Over 30 Days | <u>Penalty Per Violation Per Day</u><br>$1,000<br>$2,500<br>$5,000 |
| Failure to conduct a field survey in accordance with Paragraph 13, including failure to evaluate the | Period of Noncompliance<br>Between 1 and 30 Days | <u>Penalty Per Violation Per Day Per Tank System</u><br>$500 |

23

| Violation | Stipulated Penalties | |
|---|---|---|
| condition of all PRVs, thief hatches, mountings, and gaskets at each Tank System as required by Subparagraph 13.b and/or take the actions required by Subparagraphs 13.b.i or 13.b.ii. | Over 30 Days | $2,500 |
| Failure to complete an Engineering Evaluation for a Tank System as required by Paragraph 14. | Period of Noncompliance<br>Between 1 and 15 Days<br>Between 16 and 30 Days<br>Over 30 Days | Penalty Per Violation Per Day Per Tank System<br>$1,000<br>$2,500<br>$5,000 |
| Failure to complete and submit a Certification of Completion Report as required by Paragraph 15. | Period of Noncompliance<br>Between 1 and 15 Days<br>Between 16 and 30 Days<br>Over 30 Days | Penalty Per Violation Per Day<br>$500<br>$2,500<br>$5,000 |
| Failure to complete modifications for a Vapor Control System or temporarily shut-in Well Production Operations as required by Paragraph 16. | Period of Noncompliance<br>Between 1 and 15 Days<br>Between 16 and 30 Days<br>Over 30 Days | Penalty Per Violation Per Day Per Tank System<br>$1,000<br>$3,000<br>$9,000 |
| Failure to conduct an IR Camera Inspection of a Tank System as required by Subparagraph 17.a. | Period of Noncompliance<br>Between 1 and 15 Days<br>Between 16 and 30 Days<br>Over 30 Days | Penalty Per Violation Per Day<br>$500<br>$1,000<br>$2,000 |
| Failure to perform a modification required by Paragraph 18 or failure to meet a Performance Standard as required by Paragraph 19. | Period of Noncompliance<br>Between 1 and 30 Days<br>Over 30 Days | Penalty Per Violation Per Day Per Tank System<br>$1,000<br>$2,500 |
| Failure to develop and submit a DI/PM program as required by Paragraph 20. | Period of Noncompliance<br>Between 1 and 15 Days<br>Between 16 and 30 Days<br>Over 30 Days | Penalty Per Violation Per Day<br>$1,000<br>$2,500<br>$5,000 |
| Failure to implement and comply with the DI/PM program requirements at each Tank System, and associated Well Production Operations equipment, as required by Paragraph 20. | Period of Noncompliance<br>Between 1 and 15 Days<br>Between 16 and 30 Days<br>Over 30 Days | Penalty Per Violation Per Day Per Tank System<br>$1,000<br>$2,500<br>$5,000 |
| Failure to complete all necessary corrective actions or temporarily shut-in Well Production Operations as required by | Period of Noncompliance<br>Between 1 and 15 Days<br>Between 16 and 30 Days | Penalty Per Violation Per Day Per Tank System<br>$5,000<br>$10,000 |

24

| Violation | Stipulated Penalties | |
|---|---|---|
| Paragraph 21 and Subparagraph 21.a. | Over 30 Days | $20,000 |
| Failure to comply with the requirements of Subparagraphs 21.b, 21.c, and 21.d. | <u>Period of Noncompliance</u><br>Between 1 and 30 Days<br>Over 30 Days | <u>Penalty Per Violation  Per Day</u><br>$250<br>$1,000 |
| Failure to complete a VCS Root Cause Analysis and/or identify or implement  appropriate response actions as required  by Subparagraph 21.e. | <u>Period of Noncompliance</u><br>Between 1 and 30 Days<br>Over 30 Days | <u>Penalty Per Violation  Per Day</u><br>$500<br>$1,000 |
| Failure to equip Tank Systems with pressure monitors  in accordance with the requirements of Paragraph 22. | <u>Period of Noncompliance</u><br>Between 1 and 30 Days<br>Over 30 Days | <u>Penalty Per Violation  Per Day</u><br><u>Per Tank System</u><br>$500<br>$1,000 |
| Failure to conduct a site investigation  or VCS Root Cause Analysis  in accordance with the requirements  of Subparagraph 22.b. | <u>Period of Noncompliance</u><br>Between 1 and 15 Days<br>Over 15 Days | <u>Penalty Per Violation  Per Day</u><br><u>Per Tank System</u><br>$250<br>$500 |
| Failure to comply with the requirements of Subparagraph 22.c | <u>Period of Noncompliance</u><br>Between 1 and 30 Days<br>Over 30 Days | <u>Penalty Per Violation  Per Day</u><br>$250<br>$1,000 |
| Failure to complete the mitigation measures in accordance with the requirements  of Paragraphs 24 and 25. | <u>Period of Noncompliance</u><br>Between 1 and 30 Days<br>Over 30 Days | <u>Penalty Per Violation  Per Day</u><br>$500<br>$1,000 |

44.     For each failure to submit a Semi-Annual Report in accordance with Section VI, URO shall pay $1,000 for the first 30 Days of noncompliance  and $2,500 per Day thereafter.

45.     Stipulated penalties under this Section shall begin to accrue on the Day after performance is due or on the Day a violation occurs, whichever is applicable, and shall continue to accrue until performance is satisfactorily completed or until the violation  ceases. Stipulated penalties shall accrue simultaneously  for separate violations  of this Consent Decree.

46.     URO shall pay stipulated penalties to the United States within 30 Days of a written demand by the United States, unless URO invokes the dispute resolution  procedures under Section IX.

47.     Stipulated penalties shall continue to accrue as provided in Paragraph 45, during any Dispute  Resolution,  but need not be paid until the following:

        a.      If the dispute  is resolved by agreement of the Parties or by a decision  of EPA that is not appealed to the Court, URO shall pay accrued penalties  determined to be owing,

25

together with interest, to the United States within 30 Days of the effective date of the agreement or the receipt of EPA's decision or order.

        b.      If the dispute is appealed to the Court and the United States prevails in whole or in part, URO shall pay all accrued penalties determined by the Court to be owing, together with interest, within 60 Days of receiving the Court's decision or order, except as provided in Subparagraph c, below.

        c.      If any Party appeals the District Court's decision, URO shall pay all accrued penalties determined to be owing, together with interest, within 15 Days of receiving the final appellate court decision.

48.     URO shall pay stipulated penalties owing to the United States in the manner set forth and with the confirmation notices required by Paragraph 32, except that the transmittal letter shall state that the payment is for stipulated penalties and shall state for which violation(s) the penalties are being paid.

49.     If URO fails to pay stipulated penalties according to the terms of this Consent Decree, URO shall be liable for interest on such penalties, as provided for in 28 U.S.C. § 1961, accruing as of the date payment became due. Nothing in this Paragraph shall be construed to limit the United States from seeking any remedy otherwise provided by law for URO's failure to pay any stipulated penalties.

50.     The payment of penalties and interest, if any, shall not alter in any way URO's obligation to complete the performance of the requirements of this Consent Decree.

51.     Stipulated penalties are not the United States' exclusive remedy for violations of this Consent Decree. Subject to the provisions of Section XI (Effect of Settlement/Reservation of Rights), the United States expressly reserves the right to seek any other relief it deems appropriate for URO's violation of this Decree or applicable law, including but not limited to an action against URO for statutory penalties, additional injunctive relief, mitigation or offset measures, and/or contempt. However, the amount of any statutory penalty assessed for a violation of this Consent Decree shall be reduced by an amount equal to the amount of any stipulated penalty assessed and paid pursuant to this Consent Decree.

52.     The United States may, in the unreviewable exercise of its discretion, reduce or waive stipulated penalties otherwise due it under this Consent Decree.

## VIII.    FORCE MAJEURE

53.     "Force Majeure," for purposes of this Consent Decree, is defined as any event arising from causes beyond the control of URO, of any entity controlled by URO, or of URO's contractors, that delays or prevents the performance of any obligation under this Consent Decree despite URO's best efforts to fulfill the obligation. The requirement that URO exercise "best efforts to fulfill the obligation" includes using best efforts to anticipate any potential force majeure event and best efforts to address the effects of any potential force majeure event (a) as it is occurring and (b) following the potential force majeure, such that the delay and any adverse

effects of the delay are minimized. "Force Majeure" does not include URO's financial inability to perform any obligation under this Consent Decree.

54. If any event occurs or has occurred that may delay the performance of any obligation under this Consent Decree, whether or not caused by a force majeure event, URO shall provide notice orally or by electronic or facsimile transmission to EPA within 72 hours of when URO first knew that the event might cause a delay. Within seven Days thereafter, URO shall provide in writing to EPA an explanation and description of the reasons for the delay; the anticipated duration of the delay; all actions taken or to be taken to prevent or minimize the delay; a schedule for implementation of any measures to be taken to prevent or mitigate the delay or the effect of the delay; URO's rationale for attributing such delay to a force majeure event if it intends to assert such a claim; and a statement as to whether, in the opinion of URO, such event may cause or contribute to an endangerment to public health, welfare or the environment. URO shall include with any notice all available documentation supporting the claim that the delay was attributable to a force majeure. Failure to comply with the above requirements shall preclude URO from asserting any claim of force majeure for that event for the period of time of such failure to comply, and for any additional delay caused by such failure. URO shall be deemed to know of any circumstance of which URO, any entity controlled by URO, or URO's contractors knew or should have known.

55. If EPA agrees that the delay or anticipated delay is attributable to a force majeure event, the time for performance of the obligations under this Consent Decree that are affected by the force majeure event will be extended by EPA for such time as is necessary to complete those obligations. An extension of the time for performance of the obligations affected by the force majeure event shall not, of itself, extend the time for performance of any other obligation. EPA will notify URO in writing of the length of the extension, if any, for performance of the obligations affected by the force majeure event.

56. If EPA does not agree that the delay or anticipated delay has been or will be caused by a force majeure event, EPA will notify URO in writing of its decision.

57. If URO elects to invoke the dispute resolution procedures set forth in Section IX (Dispute Resolution), it shall do so no later than 15 Days after receipt of EPA's notice. In any such proceeding, URO shall have the burden of demonstrating by a preponderance of the evidence that the delay or anticipated delay has been or will be caused by a force majeure event, that the duration of the delay or the extension sought was or will be warranted under the circumstances, that best efforts were exercised to avoid and mitigate the effects of the delay, and that URO complied with the requirements of Paragraphs 53 and 54. If URO carries this burden, the delay at issue shall be deemed not to be a violation by URO of the affected obligation of this Consent Decree identified to EPA and the Court.

## IX. DISPUTE RESOLUTION

58. Unless otherwise expressly provided for in this Consent Decree, the dispute resolution procedures of this Section shall be the exclusive mechanism to resolve disputes arising under or with respect to this Consent Decree. URO's failure to seek resolution of a dispute under

27

this Section shall preclude URO from raising any such issue as a defense to an action by the United States to enforce any obligation of URO arising under this Decree.

59.     Informal Dispute Resolution. Any dispute subject to Dispute Resolution under this Consent Decree shall first be the subject of informal negotiations. The dispute shall be considered to have arisen when URO sends the United States a written Notice of Dispute. Such Notice of Dispute shall state clearly the matter in dispute. The period of informal negotiations shall not exceed 30 Days from the date the dispute arises, unless that period is modified by written agreement. If the Parties cannot resolve a dispute by informal negotiations, then the position advanced by the United States shall be considered binding unless, within 45 Days after the conclusion of the informal negotiation period, URO invokes formal dispute resolution procedures as set forth below.

60.     Formal Dispute Resolution.

        a.      URO shall invoke formal dispute resolution procedures, within the time period provided in the preceding Paragraph, by serving on the United States a written Statement of Position regarding the matter in dispute. The Statement of Position shall include, but need not be limited to, any factual data, analysis, or opinion supporting URO's position and any supporting documentation relied upon by URO.

        b.      The United States shall serve its Statement of Position within 45 Days of receipt of URO's Statement of Position. The United States' Statement of Position shall include, but need not be limited to, any factual data, analysis, or opinion supporting that position and any supporting documentation relied upon by the United States. The United States' Statement of Position shall be binding on URO, unless URO files a motion for judicial review of the dispute in accordance with the following Paragraph.

        c.      URO may seek judicial review of the dispute by filing with the Court and serving on the United States, in accordance with Section XIII (Notices), a motion requesting judicial resolution of the dispute. The motion must be filed within ten Days of receipt of the United States' Statement of Position pursuant to the preceding Paragraph. The motion shall contain a written statement of URO's position on the matter in dispute, including any supporting factual data, analysis, opinion, or documentation, and shall set forth the relief requested and any schedule within which the dispute must be resolved for orderly implementation of the Consent Decree.

        d.      The United States shall respond to URO's motion within the time period allowed by the Local Rules of this Court. URO may file a reply memorandum, to the extent permitted by the Local Rules.

61.     Standard of Review. Except as otherwise provided in this Consent Decree, in any dispute brought under Paragraph 60, URO shall bear the burden of demonstrating that its position complies with this Consent Decree.

62.     The invocation of dispute resolution procedures under this Section shall not, by itself, extend, postpone, or affect in any way any obligation of URO under this Consent Decree,

28

unless and until final resolution of the dispute so provides. As part of the resolution of any dispute under this Section, in appropriate circumstances the Parties may agree, or this Court may order, an extension or modification of the schedule for completion of the activities required under this Consent Decree to account for the delay that occurred as a result of dispute resolution. URO shall be liable for stipulated penalties for its failure thereafter to complete the work in accordance with the extended or modified schedule, provided that URO shall not be precluded from asserting that a force majeure event has caused or may cause delay in complying with the extended or modified schedule. Stipulated penalties with respect to the disputed matter shall continue to accrue from the first Day of noncompliance, but payment shall be stayed pending resolution of the dispute. If URO does not prevail on the disputed issue, stipulated penalties shall be assessed and paid as provided in Section VII (Stipulated Penalties).

## X.    RIGHT OF ENTRY AND INFORMATION COLLECTION AND RETENTION

63.    The United States and its representatives, including attorneys, contractors, and consultants, shall have the right of entry into and upon the Facilities at all reasonable times, upon presentation of credentials, to:

      a.    monitor the progress of activities required under this Consent Decree;

      b.    verify any data or information submitted to the United States in accordance with the terms of this Consent Decree;

      c.    obtain samples and, upon request, splits of any samples taken by URO or its representatives, contractors, or consultants related to activities under this Consent Decree;

      d.    obtain documentary evidence, including photographs and similar data related to activities under this Consent Decree; and

      e.    assess URO's compliance with this Consent Decree.

64.    Upon request, URO shall provide EPA or its authorized representatives splits of any samples taken by URO. Upon request, EPA shall provide URO splits of any samples taken by EPA.

65.    Except for data recorded by pressure monitors installed pursuant to Paragraph 22, until two years after the termination of this Consent Decree, URO shall retain, and shall instruct its contractors and agents to preserve, all non-identical copies of all documents, records, or other information (including documents, records, or other information in electronic form) in its or its contractors' or agents' possession or control, or that come into its or its contractors' or agents' possession or control, and that relate in any manner to URO's performance of its obligations under this Consent Decree. This information-retention requirement shall apply regardless of any contrary corporate or institutional policies or procedures. At any time during this information-retention period, upon request by the United States, URO shall provide copies of any documents, records, or other information required to be maintained under this Paragraph. This retention requirement does not apply to voicemail or text messages, so long as those forms of communication are not used for substantive discussions concerning compliance with the Consent

29

Decree. Nor does this retention requirement apply to URO's outside counsel retained specifically for the purpose of potential litigation.

66.     At the conclusion of the information-retention period provided in the preceding Paragraph, URO shall notify the United States at least 90 Days prior to the destruction of any documents, records, or other information subject to the requirements of the preceding Paragraph and, upon request by the United States, URO shall deliver any such documents, records, or other information to EPA. URO may assert that certain documents, records, or other information is privileged under the attorney-client privilege or any other privilege recognized by federal law. If URO asserts such a privilege, it shall provide the following: (a) the title of the document, record, or information; (b) the date of the document, record, or information; (c) the name and title of each author of the document, record, or information; (d) the name and title of each addressee and recipient; (e) a description of the subject of the document, record, or information; and (f) the privilege asserted by URO. However, no documents, records, or other information created or generated pursuant to the requirements of this Consent Decree shall be withheld on grounds of privilege.

67.     URO may also assert that information required to be provided under this Section is protected as Confidential Business Information ("CBI") under 40 C.F.R. Part 2. As to any information that URO seeks to protect as CBI, URO shall follow the procedures set forth in 40 C.F.R. Part 2.

68.     This Consent Decree in no way limits or affects any right of entry and inspection, or any right to obtain information, held by the United States pursuant to applicable federal or state laws, regulations, or permits, nor does it limit or affect any duty or obligation of URO to maintain documents, records, or other information imposed by applicable federal or state laws, regulations, or permits.

## XI.     EFFECT OF SETTLEMENT/RESERVATION OF RIGHTS

69.     This Consent Decree resolves the civil claims of the United States for the violations alleged in the Complaint filed in this action through the date of lodging.

70.     The United States reserves all legal and equitable remedies available to enforce the provisions of this Consent Decree. This Consent Decree shall not be construed to limit the rights of the United States to obtain penalties or injunctive relief under the CAA and the rules promulgated thereunder, or under other federal or state laws, regulations, or permit conditions, except as expressly stated in Paragraph 69. The United States further reserves all legal and equitable remedies to address any imminent and substantial endangerment to the public health or welfare or the environment arising at, or posed by, URO's Facilities, whether related to the violations addressed in this Consent Decree or otherwise.

71.     In any subsequent administrative or judicial proceeding initiated by the United States for injunctive relief, civil penalties, other appropriate relief relating to the Facilities, URO shall not assert, and may not maintain, any defense or claim based upon the principles of waiver, res judicata, collateral estoppel, issue preclusion, claim preclusion, claim-splitting, or other

30

defenses based upon any contention that the claims raised by the United States in the subsequent proceeding were or should have been brought in the instant case, except with respect to claims that have been specifically resolved pursuant to Paragraph 69.

72.     This Consent Decree is not a permit, or a modification of any permit, under any federal, state, or local laws or regulations. URO is responsible for achieving and maintaining complete compliance with all applicable federal, state, and local laws, regulations, and permits. URO's compliance with this Consent Decree shall be no defense to any action commenced pursuant to any such laws, regulations, or permits, except as set forth herein. The United States does not, by its consent to the entry of this Consent Decree, warrant or aver in any manner that URO's compliance with any aspect of this Consent Decree will result in compliance with provisions of URO's Permit, the CAA and the rules promulgated thereunder, or any other federal, state, or local law, regulation, permit, or other requirement.

73.     This Consent Decree does not limit or affect the rights of URO or of the United States against any third parties, not party to this Consent Decree, nor does it limit the rights of third parties, not party to this Consent Decree, against URO, except as otherwise provided by law.

74.     This Consent Decree shall not be construed to create rights in, or grant any cause of action to, any third party not party to this Consent Decree.

## XII.     COSTS

75.     The Parties shall bear their own costs of this action, including attorneys' fees, except that the United States shall be entitled to collect the costs (including attorneys' fees) against URO incurred in any action necessary to collect any portion of the civil penalty or any stipulated penalties due but not paid by URO.

## XIII.     NOTICES

76.     Unless otherwise specified in this Consent Decree, whenever notifications, submissions, or communications are required by this Decree, they shall be made in writing and addressed as follows. Any notification, submission, or communication required to be made to the United States shall be made to both the United States Department of Justice and EPA. Any notification, submission, or communication required to be made to EPA need not be made to the Department of Justice.

As to the United States
Department of Justice by email:    eescdcopy.enrd@usdoj.gov
Re: DJ # 90-5-2-1-12514

As to the United States
Department of Justice by mail:    EES Case Management Unit
Environment and Natural Resources Division
U.S. Department of Justice
P.O. Box 7611
Ben Franklin Station
Washington, D.C. 20044-7611
Re: DJ # 90-5-2-1-12514

As to EPA by email:    r5airenforcement@epa.gov
peachey.robert@epa.gov
smith.roberth@epa.gov

As to URO:    John Swanson
President & CEO
Utica Resource Operating, LLC
2167C State Route 821
Marietta, Ohio 45750
jswanson@uticaresource.com

77.    Any Party may, by written notice to the other Party, change its designated notice recipient or notice address provided above.

78.    Notices submitted pursuant to this Section shall be deemed submitted upon mailing (including emailing), unless otherwise provided in this Consent Decree or by mutual agreement of the Parties in writing.

## XIV.    EFFECTIVE DATE

79.    The Effective Date of this Consent Decree shall be the date upon which this Consent Decree is entered by the Court or a motion to enter the Consent Decree is granted, whichever occurs first, as recorded on the Court's docket.

## XV.    RETENTION OF JURISDICTION

80.    The Court shall retain jurisdiction over this case until termination of this Consent Decree, for the purpose of resolving disputes arising under this Decree, entering orders modifying this Decree, or effectuating or enforcing compliance with the terms of this Decree.

## XVI.    MODIFICATION

81.    The terms of this Consent Decree, including any attached appendices, may be modified only by a subsequent written agreement signed by the United States and URO. Where the modification constitutes a material change to this Decree, it shall be effective only upon approval by the Court.

82.    Any disputes concerning modification of this Decree shall be resolved pursuant to Section IX (Dispute Resolution), provided, however, that, instead of the burden of proof provided by Paragraph 61 the Party seeking the modification bears the burden of demonstrating that it is entitled to the requested modification in accordance with Federal Rule of Civil Procedure 60(b).

## XVII.    TERMINATION

83.    After URO has completed the requirements of Paragraphs 10-17, 22, and 24-25 of Section IV (Compliance Requirements); has thereafter maintained satisfactory compliance with this Consent Decree for a period of at least 24 months; and has paid all civil penalties and any accrued stipulated penalties under this Decree (and any interest thereon); then URO may serve upon the United States a Request for Termination, stating that URO has satisfied those requirements, together with all necessary supporting documentation.

84.    Following receipt by the United States of URO's Request for Termination, the Parties shall confer informally concerning the Request and any disagreement that the Parties may have as to whether URO has satisfactorily complied with the requirements for termination of this Consent Decree. If the United States agrees that the Decree may be terminated and approves the Request, the Parties shall submit, for the Court's approval, a joint stipulation terminating the Decree.

85.    If the United States does not agree that the Decree may be terminated, URO may invoke dispute resolution under Section IX of this Decree (Dispute Resolution). However, URO shall not invoke dispute resolution of any dispute regarding termination until 90 Days after service of its Request for Termination.

## XVIII.    PUBLIC PARTICIPATION

86.    This Consent Decree shall be lodged with the Court for a period of not less than 30 Days for public notice and comment in accordance with 28 C.F.R. § 50.7. The United States reserves the right to withdraw or withhold consent if the comments regarding the Consent Decree disclose facts or considerations indicating that the Consent Decree is inappropriate, improper, or inadequate. URO consents to entry of this Consent Decree without further notice and agrees not to withdraw from or oppose entry of this Consent Decree by the Court or to challenge any provision of this Decree, unless the United States has notified URO in writing that it no longer supports entry of this Decree.

## XIX.    SIGNATORIES/SERVICE

87.    Each undersigned representative of URO and the Assistant Attorney General for the Environment and Natural Resources Division of the Department of Justice (or his or her designee) certifies that he or she is fully authorized to enter into the terms and conditions of this Consent Decree and to execute and legally bind the Party he or she represents to this document.

88.    This Consent Decree may be signed in counterparts, and its validity shall not be challenged on that basis. URO agrees to accept service of process by mail with respect to all matters arising under or relating to this Consent Decree and to waive the formal service requirements set forth in Rules 4 and 5 of the Federal Rules of Civil Procedure and any applicable Local Rules of this Court including, but not limited to, service of a summons. URO need not file an answer to the complaint in this action unless or until the Court expressly declines to enter this Consent Decree.

## XX.    INTEGRATION

89.    This Consent Decree and its Appendices constitute the final, complete, and exclusive agreement and understanding among the Parties with respect to the settlement embodied in the Decree and its Appendices and supersedes all prior agreements and understandings, whether oral or written, concerning the settlement embodied herein. Other than deliverables that are subsequently submitted and approved pursuant to this Decree, the Parties acknowledge that there are no representations, agreements, or understandings relating to the settlement other than those expressly contained in this Consent Decree.

## XXI.    FINAL JUDGMENT

90.    Upon approval and entry of this Consent Decree by the Court, this Consent Decree shall constitute a final judgment of the Court as to the United States and URO. The Court finds that there is no just reason for delay and therefore enters this judgment as a final judgment under Fed. R. Civ. P. 54 and 58.

## XXII.    26 U.S.C. SECTION 162(F)(2)(A)(ii) IDENTIFICATION

91.    For purposes of the identification requirement of Section 162(f)(2)(A)(ii) of the Internal Revenue Code, 26 U.S.C. § 162(f)(2)(A)(ii), performance of Paragraphs 6, 9-28, 34-35, 37-38, and 63-66 is restitution or required to come into compliance with law.

## XXIII.    APPENDICES

92.    The following appendices are attached to and part of the Consent Decree:

Appendix 1 – List of Subject Facilities

DATED this 3<u>rd</u> day of <u>April</u>, 2023.

   s/Edmund A. Sargus, Jr.
UNITED STATES DISTRICT JUDGE
SOUTHERN DISTRICT OF OHIO

35

Signature Page for the Consent Decree in *United States v. Utica Resource Operating, LLC* (S.D. Ohio):

**FOR THE UNITED STATES OF AMERICA:**

TODD KIM
Assistant Attorney General
Environment and Natural Resources Division
U.S. Department of Justice


11/4/2022     *Nicholas McDaniel*
_____     _____
Date     NICHOLAS A. MCDANIEL
Trial Attorney
Environmental Enforcement Section
Environment and Natural Resources Division
U.S. Department of Justice
Washington, DC 20044-7611


KENNETH L. PARKER
United States Attorney
Southern District of Ohio


ANDREW M. MALEK (0061442)
Civil Chief
303 Marconi Boulevard, Suite 200
Columbus, Ohio 43215

Signature Page for the Consent Decree in *United States v. Utica Resource Operating, LLC* (S.D. Ohio):


**FOR THE U.S. ENVIRONMENTAL PROTECTION AGENCY:**


ROBERT KAPLAN

Digitally signed by ROBERT KAPLAN
Date: 2022.10.19 11:32:04 -05'00'

_____          _____
Date                       Robert A. Kaplan
                           Regional Counsel
                           U.S. Environmental Protection Agency, Region 5

Signature Page for the Consent Decree in *United States v. Utica Resource Operating, LLC* (S.D. Ohio):


**FOR UTICA RESOURCE OPERATING, LLC**


<u>&lt;DL 0:1 Z:Z</u>

Date

U_____

ohSwanson

President & CEO

## <u>Appendix 1 – List of Subject Facilities</u>

**Cole**
Wills Township, Guernsey County
GPS Coordinates: 40.04299, -81.3819

**Commissioners-Onega**
Wills Township, Guernsey County
GPS Coordinates: 39.9996, -81.4398

**Detweiler**
Wills Township, Guernsey County
GPS Coordinates: 39.98858, -81.3869

**Dynamite**
Wills and Richland Townships, Guernsey County
GPS Coordinates: 39.97802, -81.4208

**Neff**
Wills Township, Guernsey County
GPS Coordinates: 40.00497, -81.3912

**Stiers**
Richland Township, Guernsey County
GPS Coordinates: 39.95118, -81.4348

**Palmer**
Center Township, Morgan County
GPS Coordinates: 39.60806, -81.6686

**Miley**
Seneca and Buffalo Townships, Noble County
GPS Coordinates: 39.85269, -81.4574

**Garvin**
Adams Township, Washington County
GPS Coordinates: 39.56399, -81.5081

**Mason**
Waterford Township, Washington County
GPS Coordinates: 39.56775, -81.5891

**Neill**
Waterford Township, Washington County
GPS Coordinates: 39.53229, -81.6775

**Cunningham**
Wills  Township,  Guernsey County
GPS Coordinates: 39.98235, -81.40649

**Johnson**
Wills  Township,  Guernsey County
GPS Coordinates: 40.01571, -81.39620

**Rubel**
Richland Township, Guernsey County
GPS Coordinates: 39.92919, -81.46606

**Be ros**
Richland Township, Guernsey County
GPS Coordinates: 39.96667, -81.46174